# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JUDYLEE C. JARRETT,

        **Plaintiff,**

-vs-                                **Case No.  6:09-cv-793-Orl-31DAB**

COMMISSIONER OF SOCIAL
SECURITY,

        **Defendant.**

_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## *I. BACKGROUND*

### A.      Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on August 5, 2005, alleging an onset of disability on November 1, 1998, due to severe depression, affective/mood disorder and substance addiction disorder - alcohol. R. 89, 469, 481. Her application was denied initially and upon

reconsideration.  R. 31-32, 38, 50, 57, 465, 469.  Plaintiff requested a hearing.  On May 7, 2007, Plaintiff's attorney filed a written request that the ALJ assigned to the case recuse herself.  R. 75. On June 4, 2007, the ALJ notified Plaintiff's attorney that she would not recuse herself, and that any objections could be presented to the Appeals Council.  R. 71-72.

The hearing was held on June 11, 2007, before Administrative Law Judge Philamena Jones (hereinafter referred to as "ALJ").  R. 478-538.  In a decision dated July 20, 2007, the ALJ found Plaintiff not disabled as defined under the Act through the date of her decision.  R. 15-25.  On September 11, 2007, Plaintiff filed her objections with the Appeals Council regarding the recusal issue.  R. 474-77.  Plaintiff also timely filed a Request for Review of the ALJ's disability decision. R. 9.  The Appeals Council denied Plaintiff's request on March 20, 2009.  R. 4-8.  Plaintiff filed this action for judicial review on May 11, 2009.  Doc. No. 1.

**B.** **Medical History and Findings Summary**

Plaintiff was born in 1958 and was 49 years old at the time of the hearing.  R. 25, 482.  She has an associate's degree and past relevant work experience as a hotel concierge/receptionist and a retail sales clerk.  R. 155, 202, 483-87.

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of chronic depression.  R. 94.  After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from depression and a substance use disorder in early remission, which were "severe" medically determinable impairments, but were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 18-19.  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

-2-

the claimant is able to follow only simple instructions, complete simple tasks, avoid hazards, relate adequately to function in a workplace, and work in a low stress, low demand work environment. The claimant may have some difficulty dealing with supervisors, but she can get along with most people in the workplace.

R. 20. Based upon Plaintiff's RFC, the ALJ determined that Plaintiff could not perform past relevant work. R. 23. Considering Plaintiff's vocational profile and RFC, and based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as hotel/motel cleaner, assembler – non-precision or unskilled. R. 24. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 25.

Plaintiff now asserts four issues. First, she argues that the ALJ erred by not recusing herself when Plaintiff's counsel requested she do so. Second, she claims the ALJ erred by finding she had the RFC to perform other work in the national economy because the ALJ failed to include all of Plaintiff's limitations in the RFC and posed an incomplete hypothetical to the VE. Third, Plaintiff contends the ALJ erred by failing to apply the correct legal standards to the opinions of the treating physician and non-examining consultants. Fourth, Plaintiff contends that the appropriate remedy is to remand the case for an award of benefits. For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## II. STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

### III. ISSUES AND ANALYSIS

#### A.      Rejection of request for ALJ to recuse

Plaintiff argues that the Commissioner violated her right to due process and a full and fair hearing before an impartial Administrative Law Judge ("ALJ"). The Commissioner argues that Plaintiff has not established that the ALJ was biased or failed to provide a full and fair hearing.

On May 7, 2007, Plaintiff's counsel filed a written request that the ALJ recuse herself on the basis that:

> Request is hereby made that you recuse yourself from hearing the case of Judylee Carol Jarrett. This request is based on the fact that I have had to file complaints of judicial misconduct against you. These complaints include allegations that you have exhibited bias against my clients. As you know, there has not yet been a thorough investigation of my complaints. I am confident that an investigation will be undertaken in the near future. I hereby reallege all of the accusations made in my prior complaints. Ms. Jarrett has the right to a fair hearing before an unbiased administrative law judge. Under the circumstances present in this case, I suggest, with all due respect, that the propr action for you to take is to recuse yourself from hearing Ms. Jarrett's case pending the outcome of the investigation of my complaints against you so that it may be randomly assigned to another administrative law judge.

R. 75. On June 4, 2007, the ALJ notified Plaintiff's counsel that she was not recusing herself:

> Contrary to your assertions, as you are aware, your claims have been investigated in the past and there has been at least one finding of no bias, as well as other findings that your complaints are unfounded. However, you continue to file harassing complaints against me in each case that I am assigned to in which you are the representative.
>
> It is not possible for me to respond to such a vague request for recusal which provides no specific information as to what complaints to which you are referring. However, what is clear is that you provided no information specific to the above claimant concerning any bias or prejudice on my part to which I can respond.
>
> Due to the lack of information presented . . . it is the decision of the undersigned not to withdraw from the case.

R. 71-72. The ALJ advised counsel that any objections could be presented to the Appeals Council.

R. 72. On September 11, 2007, Plaintiff filed a complaint with the Appeals Council, which included allegations allegedly showing a pattern of retaliation against other claimants represented by Plaintiff's

attorney, who had previously filed formal complaints of judicial misconduct against ALJ Jones.  R. 474-475.

Plaintiff argues that the Appeals Council erred in failing to look into the allegations presented and did not include the results of any review in the record.  Plaintiff contends that the AC had a duty to look into the allegations of a pattern of misconduct and retaliation, and to include the results of the review in the record, based on SSA Publication No. 05-1007, which provides: "If you are appealing your claim, the Appeals Council will look into your complaint as part of your appeal. The results of the review will be part of the decision on your appeal."  57 Fed. Reg. 49186 (October 30, 1992).

Plaintiff argues the Appeals Council erred in finding: "Your representative contended the Administrative Law Judge was biased because he would not allow the vocational expert to review the medical evidence in your case" (R. 5) because Plaintiff made no contention concerning the vocational expert reviewing the medical evidence.  Plaintiff argues the AC did not consider or investigate her actual argument – that "an ALJ who is under investigation for improper, retaliatory conduct should [not] be judging cases handled by the person who is responsible for filing the charges" and whether the complaints of judicial misconduct were still pending or investigations initiated.  Plaintiff additionally argues that the Appeals Council has a duty to look into the details of such serious charges and to include the results of that review in the record submitted to the Court, including "looking into the allegations of retaliation charges " beyond the record in this case"; "communicating with the victims who are not parties to this case."

This is not the first time counsel has presented this bias argument to the Court.  Indeed, the presiding District Judge in this case, in a detailed analysis, rejected essentially the same argument in *Moise v. Commissioner of Social Security*, Case No. 6:08-cv-1701-31DAB (Feb. 22, 2010):

> Beginning in 2006, counsel for the Plaintiff has filed several judicial complaints against the ALJ in the instant case, alleging dishonesty, bias, improper attempts to influence witnesses, and retaliation. (Doc. 18 at 6). So far as the record discloses, those

complaints remain open. Based on the filing of those judicial complaints, counsel for the Plaintiff has also requested that the ALJ recuse herself, in this and several other cases. The ALJ has declined to do so, and the Appeals Council has affirmed her refusal to recuse herself. In the instant case, counsel for the Plaintiff complains that the Appeals Council failed to look into whether there was a pattern of retaliation against his clients, that it did not speak to anyone else who had filed similar complaints, and that the Council did not look beyond the administrative record in the instant case.

Counsel for the Plaintiff seeks to have the Court remand this case for the Appeals Council to "look into" his client's complaint about the ALJ. Counsel for the Plaintiff seeks to rely on statements made in SSA Publication No. 05-1007, which informs claimants that if they complain that their ALJ is not fair, "the Appeals Council will look into your complaint as part of your appeal" and "[t]he results of that review will be part of your decision on appeal." ). . . . Counsel for the Plaintiff then went on to describe at some length most if not all of the incidents underlying those charges, and others besides.

\* \* \*

As framed by counsel for the Plaintiff, the issue on this appeal is whether this case can and should be remanded for investigation by the Appeals Council, not whether the Appeals Council erred in failing to require the ALJ to recuse herself. Therefore, the latter issue is not properly before the Court. Nonetheless, the Court notes that judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *Liteky v. United States*, 510 U.S. 540, 555 (1994). "In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved." *Id*. Almost invariably, they are grounds for appeal, not recusal. *Id.*

When the issue is general bias, as is alleged here, the mere fact that other judges have reached different conclusions in a half dozen of the cases involving this attorney and this ALJ sheds little light on the issue. Reversals are inevitable; the fact that they have occurred is not evidence of bias on the part of the initial ALJ. And in this case there is no evidence from which a reviewing court could determine whether the number of reversals involving this attorney's clients before this judge is unusual. There is no evidence in the record as to how many times (if at all) this ALJ has ruled in favor of this attorney's clients. There is no evidence as to how many times (if at all) this ALJ's rulings against this attorney's clients have been affirmed. There is no evidence as to how many times other ALJs have ruled against this attorney and subsequently been reversed or affirmed by other judges, or even how many times this ALJ has ruled in favor or against other attorneys' clients, and how often those decisions were reversed or affirmed.

Even if such evidence were made part of the record, and it could be determined that the numbers between this attorney and this ALJ were significantly skewed, what would that prove? How skewed do the numbers have to be before a reviewing court

can determine that the reversals were the result of malice rather than simple mistakes? Whatever number might be required, counsel for the Plaintiff has not provided the evidence to establish it in this case.

Finally, counsel for the Plaintiff notes that it "would seem the better policy" for the ALJ to recuse herself until the charges he has raised against her have been resolved. However, unlike district judges, ALJ are not required to recuse themselves "in any proceeding in which [their] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This standard, commonly referred to as the "appearance of impropriety" standard, does not apply to administrative law judges. ALJs are employed by the agency whose actions they are reviewing. If the appearance of impropriety standard applied to them, ALJs would be forced to recuse themselves in every case.

Doc. No. 20 in Case No. 6:08-cv-1701 (slip op.) (citations omitted).

This analysis stands with equal force in this case. Plaintiff has stated an insufficient basis for the Court to remand for investigation by the Appeals Council.

**B.      RFC and the weight given to the treating physician's opinion**

*1. Treating physician*

Plaintiff claims that the ALJ should not have found her able to perform other jobs in the national economy in light of the preclusive limitations assigned by her psychiatrist, Dr. Mian, who treated Plaintiff for more than ten years. Plaintiff also argues that the ALJ failed to include Plaintiff's moderate limitations in concentration or the ability to maintain a schedule in Plaintiff's RFC, and failed to include these limitations in the hypothetical questions to the VE. R. 516-18. The Commissioner argues that the ALJ gave the appropriate weight to the opinion of the treating physician and non-examining sources.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to

do otherwise.  *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

Plaintiff argues that the ALJ erred in failing to state the particular weight she gave to the opinion of Dr. Mian, a psychiatrist, who treated Plaintiff for more than ten years.  R. 230-7, 267-78, 279-80, 228-29, 322-41, 342-464.  She contends that the ALJ erred in not giving Dr. Mian's opinion controlling weight and in giving greater weight to the opinions of the non-examining reviewing state psychologists. R. 22.  Plaintiff argues the ALJ's only reason for rejecting Dr. Mian's opinion was that "it is inconsistent with the longitudinal treatment records."  R. 22.  Plaintiff argues the ALJ's reasoning is not clearly articulated or supported by substantial evidence because the ALJ failed to articulate which parts of the 300-page record, half of which is Dr. Mian's own treatment records, are inconsistent with Dr. Mian's opinion.  Plaintiff argues instead that the evidence supports Dr. Mian's opinion that Plaintiff could not work 8 hours a day, 5 days a week, and his treatment records are the most longitudinal evidence, covering 154 pages and over a decade of treatment. She points to doctors' notes that repeatedly mention job problems (R. 302-3, 311, 414, 440, 453, 454, 459), such as scheduling issues (R. 288, 294, 300, 314a, 305, 315) and being fired (R. 234, 309, 377, 393, 398). Plaintiff also testified to being fired (R. 484, 486-7, 504), being unable to work over four hours (R. 507-8), and that she was repeatedly late to appointments with Dr. Mian's office (R. 284, 306, 314,

389, 433, 451, 459). The Commissioner argues that the ALJ's assignment of "less than controlling weight" to Dr. Mian's opinion, and her rationale, complete with specific examples for not giving Dr. Mian's opinion controlling weight, met the required legal standard.

Plaintiff argues that the ALJ erred in assigning great weight to the opinions of the non-examining, reviewing consultants because they were "consistent with the opinions and longitudinal records of Dr. Mian and Dr. Jacobs." R. 22-3. Plaintiff argues that the opinions of the state reviewing physicians were not consistent with the opinions of Dr. Mian or Dr. Jacobs. Dr. Mian opined that Plaintiff had "marked" limitations in nine mental activities and was unable to work a 40-hour work week on a reliable sustained basis. R. 281-82. Neither of the reviewing psychologists indicated Plaintiff had a "marked" limitation in any category. R. 208, 238. Plaintiff also argues that Dr. Jacobs "was never even asked" about severity of limitations, or whether Plaintiff could complete a workday. R. 202-06.

In her decision[1], the ALJ first described Plaintiff's lengthy history of treatment for her impairments of depression and a substance abuse disorder in early remission:

> Considering the record as a whole, the undersigned is also persuaded that the claimant's severe depression and substance use disorder result in the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings . . . mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentrations, persistence, or pace; and no episodes of decompensation. In reaching these conclusions, the [ALJ] has considered the opinions expressed by the State agency psychologists, Dr. Adams and Dr. Eeltink, with respect to the severity of the claimant's mental impairments, and has afforded them great weight because they are consistent with the opinions and records of Dr. Mian and Dr. Jacobs who had the benefit of actually examining the claimant.

> In December 2005 and March 2006, Dr. Adams and Dr. Eeltink, respectively, opined that the claimant's depression and substance use disorder were severe and resulted in mild and moderate restrictions and difficulties, as well as in moderate limitations in her ability to do certain mental basic work activities. Similarly, in July 2005, Dr. Mian, a psychiatrist, noted that the claimant had been receiving psychiatric treatment

---

[1]The quotations from the ALJ's decision have the citations to the applicable regulations and Exhibits omitted.

and psychotropic medications from his office for chronic depression since February 1994. In November 2005, Dr. Jacobs, a psychologist, also noted that the claimant had cocaine abuse in early full remission, with the last use 6 months in the past. However, the record shows further drug abuse relapses in 2006.

Thus, the undersigned affords great weight to the opinions expressed by the State agency psychologists, Dr. Adams and Dr. Eeltink , with respect to the severity of the claimant's mental impairments.

* * *

In social functioning, the claimant has only mild difficulties. The claimant lives with her father, and she has 1 friend. In November 2005, Dr. Jacobs also found the claimant to be cooperative and with appropriate thought content.

With regard to concentration, persistence, or pace, the claimant has only moderate difficulties. In November 2005, Dr. Jacobs noted that the claimant was able to drive, and that she had normal, tight, and logical thought processes. In February 2006, a State agency report of contact with the claimant also indicated that the claimant could follow along with soap operas very well.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation. In November 2005, Dr. Jacobs noted the claimant's report that she was unable to work only because she was either not trained well or she did not get the job she applied for. In January 2006, Dr. Mian also noted that the claimant reported feeling calmer, and that Elavil 300 mg and Xanax helped. In addition, in November 2006, Dr. Mian noted that the claimant was stable on her medications, and without adverse side effects.

R. 18-19. The ALJ continued the analysis, and made specific findings concerning Plaintiff's residual functional capacity:

At the hearing, the claimant testified that she was impaired by her depression and by her drug abuse relapses. After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible.

The claimant testified that she had a general malaise and laziness from depression, causing her to sleep 16 hours a day. However, in November 2005, Dr. Jacobs opined that the claimant had a global assessment of functioning (GAF) score of as much as 61 to 70. In November 2006, Dr. Mian also noted that the claimant was stable on her medications. . . .

* * *

. . . In July 2005, Dr. Mian also noted that the claimant had been on psychotropic medications since 1994; however, she had been able to work at substantial gainful activity levels after that time. In November 2006, Dr. Mian further noted that the claimant denied having medication side effects. . . .

In a form completed by the claimant, in August 2005, she stated that her alternative methods of treating pain included psychotherapy and group therapy. In November 2005, Dr. Jacobs also noted that the claimant started biweekly outpatient treatment for depression in 2005. The medical evidence, however, fails to show that the claimant had been required to use an alternative treatment method that imposed limitations or restrictions by its frequency of treatment duration, disruption to routine, or adverse side effects since the alleged onset date of disability. Moreover, the record as a whole consists primarily of psychiatric records, and reflects a general paucity of non-psychiatric medical records between 1987 and 2005.

Thus, while it is reasonable to conclude that the claimant has had some limitations, the evidence as a whole does not substantiate any cause for such debilitating limitations as described by the claimant that would preclude all work activity. Moreover, the claimant has had a lot of work between 1999 and 2004, although not at SGA level; and she has recently been a volunteer at a hospital, in addition to having pending applications for jobs such as a hospital kitchen worker (which she did not get), a guest services clerk, and a Nickelodeon receptionist or concierge.

R. 21-22.

Turning specifically to Dr. Mian's and Dr. Jacob's records, the ALJ found:

In March 2007, a questionnaire completed by Dr. Mian indicated that the claimant had marked limitations in her ability to perform basic mental work activities. However, this particular opinion is not afforded controlling weight because it is inconsistent with the longitudinal treatment records. In July 2002, Dr. Mian noted the claimant's report that her medication, Klonopin, was working and that Xanax helped, both without adverse side effects. In October 2004, Dr. Mian also noted the claimant's report that she was okay with medications, and that she had no adverse side effects. In November 2005, Dr. Jacobs noted the claimant's report of having memory lapses, blackouts, and fatigue from medication side effects. However, Dr. Jacobs also opined that the claimant had a [GAF] score of as much as 61 to 70. In January 2006, Dr. Mian noted the claimant's report that she felt calmer, with Elavil 300 mg, and that Xanax helped. In February 2006, Dr. Mian further noted the claimant's report that she had cut down on her medications because she felt better, and that she had 6 months of sobriety from drugs. In addition, in November 2006, Dr. Mian opined that the claimant was stable, noting her report that she was happy with her medications, and that she had no adverse side effects. Thus, the undersigned finds that the claimant does not have marked limitations in her ability to perform mental basic work activities.

R. 22.

Following this detailed analysis, the ALJ summarized her reasons for giving controlling weight to the opinions of the non-examining physicians:

> [The ALJ] has considered the opinions expressed by the State agency psychologists, Dr. Adams and Dr. Eeltink, with respect to the claimant's mental residual functional capacity, and has afforded them great weight because they are consistent with the opinions and longitudinal records of Dr. Mian and Dr. Jacobs who had the benefit of actually examining the claimant. In December 2005, Dr. Adams opined that the claimant was able to get along with most people in the workplace. In March 2006, Dr. Eeltink also opined that the claimant was able [to] follow only simple instructions, complete simple tasks, avoid hazards, relate adequately to function in a workplace, and work in a low stress, low demand work environment.
>
> Similarly, in 2002, 2004, and 2006, Dr. Mian's longitudinal treatment records reflected that the claimant's medications were working, without side effects, and that the claimant was okay, feeling calmer, feeling better, and stable. In November 2005, Dr. Jacobs also noted that the claimant was cooperative, and with appropriate thought content, as well as with normal, tight, and logical thought processes.
>
> The claimant has had relapses of drug abuse in August 2005, February 2006, and December 2006. However, as previously discussed, the longitudinal treatment record reflects that claimant was otherwise calm, better, and stable on her medications. In addition, in November 2005, Dr. Jacobs opined that the claimant had a [GAF] score of as much as 61 to 70.
>
> Thus, the undersigned affords great weight to the opinions expressed by the State agency psychologists, Dr. Adams and Dr. Eeltink, and finds that the claimant can follow simple instructions, complete simple tasks, avoid hazards, relate adequately to function in a workplace, and work in a low stress, low demand work environment. The undersigned further finds that the claimant may have some difficulty dealing with supervisors, but she can get along with most people in the workplace.

R. 23.

As the Commissioner points out, Plaintiff had received treatment for two decades, and the records begin with Plaintiff's hospitalization for bulimia in August 1986, after taking 45 laxatives[2]. R. 113, 168-89; R. 22, 283-321, 342-464, 501. The treating psychiatrist, Dr. Weibel opined there was "no need for any significant medical intervention" from the "mild bulimia." R. 174. She was

---

[2]Although the diagnosis was bulimia and borderline personality disorder, the treatment notes reflect that she went to the hospital under the guise of binging and purging four times a week, but on further investigation it was shown that she was still mourning the loss of a love object, mourning the loss of her parents, and having problems at work. R. 170.

diagnosed with bulimia, alcohol abuse, and borderline personality disorder at Quakertown Hospital in Pennsylvania. R. 176. She was diagnosed with major depression, alcohol abuse, and bulimia when see again at Quakertown Hospital in April 1987. R. 183.

She first saw Dr. Mian in October 1993 for treatment related to marital problems. R. 464. She was not seen again until 1997, after she was mugged and feeling anxious about it; she was drinking 2-6 beers a day – on and off. R. 462. Dr. Mian restarted her on Prozac. R. 462. In January 1998, Dr. Mian noted that Plaintiff struggles with intermittent dip from depression which is always triggered by a situation; "Patient claims that she [is] abstaining from alcohol." R. 461. In April 1998, Plaintiff filed for bankruptcy and she was being harassed by a "guy at work," but had sought help from the authorities; she sought an increase in her prescription for Klonapin. R. 456. One month later, Dr. Mian noted that Plaintiff was working at the front desk in a Disney hotel, where she was frustrated and had a lot of stress because she did not like her new job assignments. R. 454. "Per patient's request - right now patient overdoing Klonapin because of lots of stress." R. 454. In July 1998 Plaintiff told Dr. Mian that she was stressed out (he noted "histrionic"), claiming she was going through discriminatory treatment at work. R. 453. She told Dr. Mian that she could not survive without the Klonapin and was keeping the higher at least until after she recovered from hysterectomy surgery; she also asked for a prescription for Xanax. R. 453; 452. On August 1998, she was upset after her hysterectomy and not being able to have children; she planned to start "new work location." R. 451., She was described as "situationally reactive." R. 451. One week later, she was having problems with bulimia again and Prozac "didn't help at all" so she asked for trials of Zoloft and Trazadone. R. 449. The following week she asked for Xanax because she had a lot of stress and was having a difficult recuperation. R. 448. Apparently, Plaintiff was scheduled to go back to work on August 31, 1998; she was unable to reduce the Xanax and insisted on taking it. R. 447. By

September 14, 1998, she was to begin tapering off the Xanax because she was doing "fair."  R. 446.

According to treatment notes from October 2, 1998, her "appendix burst" Dr. Mian noted in quotations, and Plaintiff was "very disturbed – she claims that her employer is calling and is being very demanding"; she needed more Xanax, still unable to cut down.  R. 445.  She remained on medical leave on October 12, 1998, and told Dr. Mian, "I am unable to reduce [Xanax] at all."  R. 444.  She asked to switch to Klonapin to "make weaning off Xanax easier" and Dr. Mian changed her prescription.  R. 442.  In November 30, 1998, Plaintiff quit her job because of "imminent firing" but she told him "she already has a job with SW [Southwest]."  R. 440.

In January 1999, Dr. Mian noted that Plaintiff finds it very anxiety-provoking to reduce Klonapin, but is willing to wok at it.  R. 439.  By April 26, 1999, Plaintiff was "doing good and relatively stress free.  She quit her job about four to six weeks ago.  Patient leaving with her fiancé."  R. 437.  She was down to a lower dose of Klonapin.  R. 437.  On June 1, 1999, Dr. Mian noted Plaintiff had gotten married and was still "on leave."  R. 436.  She increased Trazadone in August 1999 to better control her sleep because she was struggling with pain/anxiety.  R. 435.  Two months later in October 1999, she began the first of a series of complaints about her husband's abuse of alcohol; she was unemployed.  R. 433; *see also* R. 431, 430 (January 2000); 397 (February 2002); 396 (March 2002).  The next month, she was "happy with her medications and denied any side effects." R. 432.  In February 2000 her husband ended up in jail for domestic violence; he was in treatment in March.  R. 428-29.

A counselor at Dr. Mian's office noted on June 29, 2000 that Plaintiff had recently been Baker Acted (involuntarily committed), "and complains that such treatment was inappropriate" because she was apparently released 12 hours later.  R. 424, 426.  She had mildly improved by July and was taking Wellbutrin, which "helped some" and she denied side effects.  R. 423, 425.  She reported feeling

better by August 31, 2000, and told Dr. Mian on September 19, 2000 that "my [medications] finally are just right." R. 420-21. She remained stable through the end of 2000. R. 419.

In February 2001, Plaintiff was complaining about job discord, apparently at her job at Publix. R. 413-14. Her husband was drinking alcohol again. R. 413. In May and June 2001, she told Dr. Mian that her stepmother was dying of pancreatic cancer and she had anger towards her. R. 409-11. She requested additional Klonapin to help her "survive." R. 407-08. She continued to focus on bereavement issues into July 2001, and showed some improvement by the end of that month. R. 405-06. On August 15, 2001, Plaintiff told Dr. Mian that "I have been through a lot. Mother died, two friends moved away, husband is drinking again and I am not getting a job." R. 403. She was also going through premature menopause. R. 403. By October 2001, Plaintiff had found a job for twenty-five hours per week as a receptionist at the Honda dealership, around the corner from where her father lives; "He lost his job."[3] R. 399. Plaintiff ended up being let go during the ninety-day probation, but she told Dr. Mian, "I am looking for a job." R. 398.

By May of 2002, Plaintiff's husband's drinking and instability had become a problem once again and her marital problems continued. R. 391-95. She told Dr. Mian on July 18, 2002 that her "medication is working" but she had gotten "fired" again. R. 393. She was having panic attacks and asked to switch medications. R. 393. She was going through stress but happy with her medications by August 2002. R. 390. Plaintiff was arrested in the August 2002 timeframe and her spouse was Baker Acted then in rehab. R. 388-89. Her finances were in disarray. R. 388. She requested a change in medication to increase the Klonapin. R. 388. In October 2002, Plaintiff got a job in the hospitality department of a hotel; she claimed the medications helped. R. 387. By December 2002, she was separating from her spouse. R. 386. The next month, in January 2003, her husband went back to rehab and someone stole money out of her account with her ATM card. R. 385.

---

[3]It is not clear if Plaintiff was referring to her husband or her father. R. 399.

Plaintiff was arrested and charged with allowing underage adolescents at her house to become intoxicated in January 2003; one of these teenagers stole her ATM card and pin number to steal from her account; she was charged with nine counts of "causing teenagers in the neighborhood to get drunk" in June 2003. R. 383-84; 378. She eventually received probation and, as a condition, had to attend "supportive sessions with Larry Muse to work on alcohol education issues in regards to her lack of awareness of liability of serving minors in her home. R. 376-77.

She took a new job in January 2003 with H & R Block, which finished on April 15, then she planned to send out her résumé. R. 381-82. However, her girlfriend of thirty years was recently diagnosed with cancer and it was hard on her, so she planned to be there for her friend in Pennsylvania when she received chemotherapy. R. 379. She had lost another job by August 5, 2003, and although she was looking for another job in October 2003, she took a trip to Pennsylvania to see her dying friend. R. 377. By January of 2004, she was "okay with medications." R. 369. In March 2004 she was again looking for a job and was happy with her medications. R. 368. However, in April 2004, she told Dr. Mian she was "stressed and [she] needed lots of counseling before [she] can go back to work" although there is no detail of why Plaintiff felt that way. R. 367. In April 2004, she admitted to smoking crack cocaine, and admitted to Dr. Mian in June 2004 that she had been smoking it for the previous six months; she was stealing from her father to support her crack cocaine habit. R. 364-65. She detoxed at the hospital on November 17, 2004. R. 362. She was selling her house in December 2004 and she was losing her Walt Disney World insurance. R. 358. She asked for another change in medications in January 2005. She had been off Prozac for one month in April 2005, and was requesting new medications. R. 356. She had been using crack cocaine again in June 2005, but had been clean for one week at the appointment. R. 355. Plaintiff was subsequently hospitalized in August 2005 and December 2006 for cocaine abuse. R. 190-201, 256-65, 342-55.

In July 2005, Plaintiff went to vocational rehabilitation and she was attending NA. R. 352. She remained sober for that month, relapsing in early August 2005. R. 350. She told the counselor that later in August 2005, while using crack cocaine she was kidnapped by drug dealers and her life threatened, and her father paid a $3,000 ransom. R. 348-49. She remained off the crack cocaine for four months by October 2005, admitting to Dr. Mian that she had used it for one year and four months before that. R. 344. He changed his diagnosis to "possible bipolar disorder not otherwise specified." R. 344. Her father granted her freedom to drive his car and run errands by late 2005; however she relapsed in December 2005. R. 343; 235.

Plaintiff remained sober until at least January 2006, but relapsed sometime in February. R. 277. She remained sober after that through mid-2006 and had not used crack cocaine since her father was hospitalized. R. 274. Dr. Mian noted in January 2006, that Plaintiff "consistently failed to maintain any decent job; all jobs (about 7) got fired from all of them"; medicine was working, but (he quoted Plaintiff) "not well enough." R. 234.

Plaintiff began volunteering at Sand Lake Hospital in September 2006, but relapsed in late 2006 and was Baker Acted two times, where she was diagnosed as bipolar with a history of cocaine dependence. R. 260-65, 268.

In March 2007 – nine years after Plaintiff's alleged onset date – Dr. Mian completed a questionnaire not on an SSA form, but on a form similar to a mental residual functional capacity (MRFC) assessment (R. 281-82), with the significant difference that, unlike the SSA-generated MRFC assessments, the questionnaire did not allow Dr. Mian to select from various degrees of limitation ("not significant," "moderate," or "marked"); rather, the questions were framed in terms of "marked" limitation and required a "yes" or "no" response. R. 208-11, 238-41, 281-82. Dr. Mian opined that Plaintiff's marked limitations in nine mental activities had existed since December 31, 2003 – or five years *after* Plaintiff's alleged onset date. R. 281-82.

The ALJ properly rejected Dr. Mian's opinion, which cited specific treatment notes from Dr. Mian, noting that the July 2002 and October 2004 records showed that Plaintiff's medications were working and that she was not experiencing side effects. R. 22, 361, 393. The ALJ cited January and February 2006 records that showed Plaintiff felt calmer and better, with six months of sobriety from drugs (although in reality, Plaintiff relapsed during that general time period while her father was hospitalized - R. 274). R. 230-31. In November 2006, Dr. Mian noted again that Plaintiff was stable, happy with her medications and not having any adverse side effects; in March 2007, Plaintiff was stable and had been able to reduce her use of Klonopin. R. 267, 269.

The ALJ also cited other evidence in the record, such as Dr. Jacobs' consultative evaluation in November 2005 that reported Plaintiff had a global assessment of functioning (GAF) score in the range of 61 to 70, which measured "some mild symptoms . . . but generally functioning pretty well, has some meaningful interpersonal relationships." R. 22, 206. Similarly, Plaintiff's GAF score upon discharge from her three-day hospital admission in December 2006 was estimated to be 60-65 by the hospital psychiatrist, Floro Porcincula, M.D. R. 257.

The ALJ assigned "great weight" to the opinions of the two non-examining state agency sources, Ann J. Adams, Psy.D., and K. Eeltink, Ph.D., licensed psychologists, finding they were consistent with the opinions and longitudinal records of Dr. Mian and the consultative examination of Dr. Jacobs, who had the benefit of actually examining Plaintiff. Dr. Adams completed a Psychiatric Review Technique Form (PRTF) in December 2005 rating the severity of Plaintiff's mental impairment; she determined that Plaintiff had depressive syndrome and a substance addiction disorder, and assessed Plaintiff's functional limits in four broad categories and determined that Plaintiff had "moderate" limitations in the activities of daily living and maintaining social functioning and "mild" limitations in maintaining concentration, persistence or pace. R. 212-222. Dr. Adams also

completed an MRFC assessment[4] (R. 208-11), finding Plaintiff to be "moderately" limited in four out of twenty categories, including the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism, and the ability to respond appropriately to changes in the work setting. R. 208-09.

The other non-examining physician, Dr. Eeltink determined that Plaintiff suffered from a depressive disorder and substance addiction disorder, assessing a "moderate" degree of limitation in maintaining concentration, persistence or pace and "mild" restrictions of activities of daily living and maintaining social functioning and "moderate" limitations in nine of the twenty categories on the MRFC. R. 238-45, 252. The ALJ's RFC finding was based partially on Dr. Eeltink's very detailed narrative comments concerning her conclusions. R. 23, 241.

Dr. Paul Jacobs saw Plaintiff for a consultative examination (CE) in November 2005. R. 202-07. After his interview of Plaintiff, Dr. Jacobs concluded that Plaintiff's prognosis was fair, and that she had low self-esteem and a dysthymic disorder. R. 204-06. Dr. Jacobs's evaluation of Plaintiff's functioning (GAF), in the range of 61 to 70, measured only mild symptoms. R. 206.

The Court finds that the ALJ's decision to discount the opinions of Dr. Mian on the non-SSA form and her giving "great weight" to the opinions of the non-examining physicians was based on substantial evidence. Dr. Mian's notes reflect very little treatment or therapy, other than to "continue patient on medications" – most are one sentence or less and are no more quotations or descriptions of major events in Plaintiff's life.

   2.  *Failure to include limitations: concentration and ability to maintain a schedule*

_____

[4]The Mental Residual Functional Capacity Assessment requires a more detailed assessment than the PRTF and is used at steps 4 and 5 of the sequential evaluation process. It itemizes various functions contained in the broad categories summarized on the PRTF. SSR 96-8p.

Plaintiff argues that the ALJ erroneously failed to properly include moderate limitations in concentration (R. 19) in Plaintiff's RFC, and failed to include it in the hypothetical questions to the VE (R. 516-18). Plaintiff contends that a limitation to "simple instructions" (R. 20, 516) is not the equivalent of restricted concentration.

The Commissioner contends that Plaintiff's argument fails to recognize that Plaintiff's limitation in concentration was factored in by the ALJ at step two of the sequential evaluation process when determining whether she had a "severe" impairment (at R. 18-19), and that establishing a "severe" impairment is a de minimis burden because an impairment can be considered as not severe only if it is a slight abnormality that has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, citing *Brady v. Heckler*, 724 F.2d 914, 922 (11th Cir. 1984). The ALJ determined at Step 2 that Plaintiff's depression, which manifested in part as a "moderate" difficulty in concentration, was "severe" (R. 18).

The ALJ found that Plaintiff had "moderate" difficulty in maintaining concentration, based on the opinions of two state agency non-examining sources (R. 18), based on the opinion of Dr. Adams who concluded that Plaintiff had intact memory and concentration (R. 225) and Dr. Jacobs's report that Plaintiff had normal, tight, and logical thought processes, and was able to drive. R. 19, 202. The Commissioner also points to the ALJ's reasoning that Plaintiff reported that she was able to follow along with soap operas when watching TV and Plaintiff's statements to Dr. Jacobs that the reason she could not work was that she was either not trained well or did not get jobs, not that she had problems with concentration. R. 19, 137, 205.

In fact, the ALJ did include in the hypothetical to the VE a limitation on Plaintiff's ability to concentrate. R. 518. The ALJ's question posed to the VE:

> Assume [a younger individual between 40 and 49 who has the education and past relevant work described for claimant]. The individual could understand, remember, carry-out simple . . . tasks and concentrate for *brief periods of time*, although no time limitations given. The individual would have moderate difficulties getting along with supervisors, but she can get along with most people in a workplace.

R. 518 (emphasis added). The VE responded to this hypothetical question that the individual could work as a hotel/motel cleaner (1,000,000 jobs in the national economy) or as a non-precision (unskilled) assembly worker (170,000 jobs in the national economy) R. 517, 519. Plaintiff argues that it was inadequate because it did not include a time limitation on the ability to concentrate, and even a ten percent limitation in the ability to concentrate would prevent an individual from working (the time limit Plaintiff's counsel proposed in a hypothetical - R. 534). The Commissioner contends that the ALJ is not required to include limitations in the hypothetical that are not supported by the evidence in record, and Plaintiff has cited to no requirement that a time limit on the ability to concentrate be included in the hypothetical question. Moreover, Plaintiff's argument that "[b]oth state consultants,

to whom the ALJ assigned great weight, felt that Ms. Jarrett has significant limitations in concentration" is misleading, since the non-examining reviewers opined she had "moderate" limitations in concentration, reflected in the ALJ's hypothetical. R. 23, 208, 238.

The ALJ also posed the hypothetical which included the concept of the ability to follow simple instructions (R. 516-17), which Plaintiff concedes, but argues that this is not the equivalent of the ability to concentrate, citing SSA regulations which list different examples for "difficulty maintaining attention or concentrating" and "difficulty understanding or remembering detailed instructions." 20 C.F.R. §404.1569a(c)(ii) and (iii).

The Commissioner points to the MRFC assessment form for the point that the ability to follow simple instructions and to maintain attention and concentration for extended periods measured different aspects of the ability to sustain concentration and persistence., The MRFC form contains

twenty categories of mental activities described falling under four broad headings, one of which was "[s]ustained concentration and persistence" (Tr. 208-11, 238-41). Two of eight activities under that broad heading were "[t]he ability to carry out very short and simple instructions" and "[t]he ability to maintain attention and concentration for extended periods." R. 208, 238. The ALJ's inclusion of a limitation on concentration and following simple instructions in the hypothetical and the ALJ's reliance on the VE's response, were based on substantial evidence.

Plaintiff also argues that the ALJ erred in failing to include in the hypothetical question Plaintiff's alleged inability to maintain a full-time schedule based on the opinion of Dr. Mian and Dr. Eeltink, who opined that Plaintiff had moderate limitations in the ability to maintain a schedule, be punctual, or complete a normal workday. R. 238-39. In response to Plaintiff's counsel's questioning, the VE testified that missing more than three days a month would result in termination (R. 524), and that the relevant jobs require being punctual, and that being late beyond customary allowances would result in termination. R. 525.

The Commissioner responds that the ALJ appropriately excluded alleged limitations on Plaintiff's ability to maintain a full-time schedule and properly formulated the hypothetical questions posed to the VE on the evidence in the record that she found to be credible, which included the instructions on the MRFC assessment forms. The MRFC form instructions state that each mental activity listed must be evaluated within the context of the individual's capacity to sustain that activity over a normal workday and workweek, on an ongoing basis. R. 208, 238. The non-examining, reviewing psychologists, Dr. Adams and Dr. Eeltink, implicitly considered Plaintiff's ability to "sustain the activity over a normal workday and workweek on an ongoing basis" in completing the MRFC assessment forms. R. 208, 238. Dr. Adams assigned "no" significant limitation in this activity and Dr. Eeltink found that Plaintiff was "moderately" limited. R. 208, 238. If either psychologist opined that Plaintiff could not sustain concentration or maintain regular attendance, they would have

checked she was "markedly" limited, but they did not. R. 208, 238. The ALJ's decision not to include the limitation on the ability to maintain a full-time schedule in the hypothetical was supported by substantial evidence.

## IV. CONCLUSION[5]

The record in this case shows that Plaintiff does not enjoy full health and that her lifestyle and activities are affected by her mental health issues to some degree. The ALJ appropriately considered these circumstances and analyzed them in relation to the exacting disability standard under the Social Security Act. For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence. Accordingly, it is respectfully recommended that the Court **AFFIRM** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g), and direct the clerk to enter judgment consistent with this opinion and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on, June 1, 2010.

*David A. Baker*
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy

---

[5]Given the Court's recommendation to affirm the ALJ's decision, the Court need not reach Plaintiff's arguments concerning a remand for benefits.